UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

**DARLENE J. BLOOMQUIST** and /
**LARRY L. BLOOMQUIST,** her husband, /
/
              Plaintiffs, /
/
vs. / **09 CV 5086**
/
**C.R. BARD, INC.,** a New Jersey corporation, /
and **BARD PERIPHERAL VASCULAR, INC.,** /
(a subsidiary and/or division of defendant /
C.R. BARD, INC.) an Arizona corporation, /
/
              Defendants. /

## C O M P L A I N T

**NOW COME** the Plaintiffs, DARLENE J. BLOOMQUIST and LARRY L. BLOOMQUIST, and for their Complaint against the Defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., a subsidiary corporation and/or division of C.R. BARD, INC., allege as follows:

### THE PARTIES

1.    Plaintiffs, DARLENE J. BLOOMQUIST and LARRY L. BLOOMQUIST, are husband and wife. At all times relevant to this cause of action, plaintiffs, DARLENE J. BLOOMQUIST and LARRY L. BLOOMQUIST are citizens and residents of the State of Missouri.

2.    The defendant, C.R. BARD, INC., is a New Jersey corporation, with its principal place of business at 730 Central Avenue, Murray Hill, New Jersey, and conducts business throughout the United states including in the State of Missouri. At all times relevant hereto,

1

Defendant, C.R. BARD, INC., was or has been engaged in business in Missouri, and has conducted substantial business activity in Missouri. Defendant has also carried on solicitations or service activities in the State of Missouri.

3. The defendant, BARD PERIPHERAL VASCULAR, INC., a wholly owned subsidiary and/or division of C.R. BARD, INC., with its principal place of business at 1625 West 3rd Street, Tempe, Arizona, conducts business throughout the United States, including in the State of Missouri. At all times relevant hereto, Defendant, BARD PERIPHERAL VASCULAR, INC., was or has been engaged in business in Missouri, and has conducted substantial business activity in Missouri. Defendant has also carried on solicitations or service activities in the State of Missouri.

**STATEMENT OF VENUE AND JURISDICTION**

4. Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1) because the plaintiffs and the defendants are citizens of different states, and the amount in controversy exceeds $75,000, excluding interest and costs.

5. Venue is proper in this Court under 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district. Surgical placement, as well as removal, of DARLENE BLOOMQUIST'S Recovery™ Filter System was performed in Branson, Missouri at Skaggs Community Health Center, said facility being within this judicial district.

6. This action is filed within the applicable limitations period under Missouri law.

## GENERAL BACKGROUND ALLEGATIONS

7. On or about May 22, 2007, DARLENE BLOOMQUIST, sustained injuries when a medical devise that had been previously implanted in her body (in 2005) failed. This medical device is called an "inferior vena cava filter" or "IVC filter" and is discussed in more detail *infra*.

8. On or about July 27, 2005, DARLENE BLOOMQUIST underwent total left knee arthoplasty surgery. As a result of her prior history of deep venous thrombosis, DARLENE BLOOMQUIST'S physicians concluded that she was at high risk for the development of medical conditions called "deep vein thrombosis" and "pulmonary embolus", discussed in more detail *infra*. As a result, prior to the surgery, on or about July 25, 2005, DARLENE BLOOMQUIST underwent an endovascular procedure to implant a Recovery™ Filter System IVC filter to prevent pulmonary embolus at Skaggs Regional Medical Center in Branson, Missouri.

9. On or about May 22, 2007, DARLENE BLOOMQUIST, was admitted to the emergency room at St. Joseph's of Macomb (located in Michigan) for chest pain and shortness of breath. She underwent CT scan of the abdomen and pelvis at that institution. At or near that time, DARLENE BLOOMQUIST's physicians discovered that the Recovery™ Filter System had failed. Specifically, the "struts" of the Recovery™ Filter System had fractured and migrated to DARLENE BLOOMQUIST's vital organs.

## IVC FILTERS GENERALLY

10. IVC filters first came on the medical market decades ago. Over the years, several different medical device manufacturers have introduced several different designs of IVC filters.

11. An IVC filter is a device that is designed to filter or "catch" blood clots (called "thrombi") that travel from the lower portions of the body to the heart and lungs. IVC filters

3

may be designed to be implanted, either permanently or temporarily, in the human body, more particularly, within the inferior vena cava.

12. The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body. In certain people, for various reasons, thrombi travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. Often times, these thrombi develop in the deep leg veins. These thrombi are called "deep vein thrombosis (i) or 'DVT'". Once thrombi reach the lungs, they are considered "pulmonary emboli" or "PE". Pulmonary emboli present grave risks to human health. They can, and often do, result in death.

13. Certain people are at increased risk for the development of DVT or PE. For instance, someone who undergoes knee or hip joint replacement surgery is at risk for developing DVT/PE. Obese patients are also at increased risk for DVT/PE. So too are people who have vascular diseases or whom have experienced previous strokes. A number of other conditions predispose people to develop DVT/ PE.

14. Those at risk for DVT/PE can undergo medical treatment to manage the risk. For example, a doctor may prescribe medications like Heparin, Warfarin or Lovenox to regulate the clotting factor of the blood. In some people who are at high risk for DVT/PE, or who cannot manage their conditions with medications, physicians may recommend surgically implanting an IVC filter to prevent thromboembolitic events.

15  As stated *supra*, IVC filters have been on the market for decades. The first IVC filter was introduced in the late 1960's. Since then, the market has been supplemented with all types and designs of filters offered by many different manufacturers.

16  Over the years, a concern developed within the medical community (and was shared by IVC filter manufacturers) that an IVC filter should be designed and manufactured that is able

to be retrieved from the human body. Ultimately, retrievable IVC filter designs were offered in the market. However, these IVC filter designs were not intended to remain within the human body for indeterminate periods of time. In other words, the initial designs of retrievable IVC filters were intended to remain implanted for a finite period of time.

17.     The IVC filter at issue in this case bears the trademark name "Recovery™" filter or "Recovery™ Filter System". The Recovery™ Filter System was manufactured, marketed and sold by the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., from 2002 until 2005.

18.     The Recovery™ Filter System was introduced to the market in 2003 as a device that was designed by the defendants to be retrieved after an indeterminate time of placement within the human body.

## THE RECOVERY™ FILTER SYSTEM

19.     In 2002, the defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., applied to the United States Food and Drug Administration for approval of an IVC filter called the Recovery™ Filter System.[1]  In 2002, the Recovery™ Filter System was approved by the F.D.A. for permanent placement. It was subsequently approved by the FDA as a "retrievable" device.

20.     The Recovery™ Filter System is constructed of a nickel – titanium alloy (also called "Nitinol"). This composite material is unique. Nitinol is actually an acronym that stands for **Ni**ckel **Ti**tanium **N**aval **O**rdnance **L**aboratory. Nitinol was developed by Navy scientists in 1962 as a material to be used in ordnance. Nitinol is also unique as it possesses "shape memory".

---

[1] C.R. Bard, Inc. applied for marketing approval of the Recovery™ Filter System under Section 510(k) of the United States Food, Drug and Cosmetic Act (21 U.S.C. § 360). In so doing, C.R. Bard, Inc. represented to the F.D.A. that the Recovery™ Filter System was substantially equivalent to a predecessor device, the Simon Nitinol IVC filter. As such, the Recovery™ Filter System did not undergo a pre-market approval scrutiny.

5

That is, Nitinol will change shape according to change in temperature, and then, retake its prior shape after returning to its initial temperature. This quality makes Nitinol appealing for use in certain medical devices, including IVC filters.

21    The Recovery™ Filter System was first marketed for sale by the defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., in April 2003. On or about October 15, 2003, C.R. BARD, INC. executive John H. Weiland[2] was quoted as stating, "We are taking a very measured approach with our rollout of the Recovery™ in order to position ourselves well for long-term success with this exciting new product." Despite Mr. Weiland's comments to company shareholders, the Recovery™ Filter System was pulled from the market in October 2005, just a little over two years after its introduction to the market and the comments made by C.R. BARD, INC.'s President and Chief Operating Officer.

22    Although a crude analogy, the Recovery™ Filter System resembles an "upside down umbrella" with the fabric removed. It consists of twelve "struts" or legs. There are six long struts and six shorter struts. The shorter struts are positioned above the longer struts. All of the struts are held together by a Nitinol "cap" located at the top of the device. The shorter struts were designed to be "centering" or "positioning" struts to assist in the proper centering of the filter when placed within the vena cava.

23.    The Recovery™ Filter System is inserted into the human body in endovascular fashion. That is, the Recovery™ Filter System is inserted *via* catheter that is guided by a physician[3] through a blood vessel into the inferior vena cava. The Recovery™ Filter System was designed to be retrieved in a somewhat similar fashion.

---

[2] Mr. Weiland is, or was, C.R. Bard, Inc.'s President and Chief Operating Officer.

[3] Typically, although not universally, an IVC filter is placed by an interventional radiologist. The procedure is called an "endovascular" medical procedure.

6

24. Following endovascular placement of the Recovery™ Filter System, the physician typically uses imaging studies (like x-rays, "vena cava grams" or CT scans) to confirm successful placement and positioning of the device within the vena cava.

## SALES OF THE RECOVERY™ FILTER SYSTEM

25. The Recovery™ Filter System was on the market from April 2003 until October 2005, a total of two and one-half years. Upon information and belief, the defendants sold at least approximately 35,000 of the Recovery™ Filter Systems during the time the device was on the market.[4]

## DOCUMENTED FAILURE OF THE RECOVERY™ FILTER SYSTEM

26. There is documented medical evidence of the fact that the Recovery™ Filter System is prone to failure following placement within the human body. Since its introduction in 2003, several reports of studies have been published in medical journals and other written works which address the efficacy and safety of the Recovery™ Filter System. These medical studies and reports indicate that the Recovery™ Filter System is prone to failure.

27. The aforementioned studies report that the Recovery™ Filter System's struts are prone to fracture, and then, migrate to locations within the human body. Most typically, the fractured struts migrate to the heart and lungs of the victim. These studies report a fracture rate of the Recovery™ Filter System struts ranging between 21% and 31.7%.[5]

---

[4] The successor device to the Recovery™ Filter System is the G2™ Filter System, manufactured by the Defendants, C.R. Bard, Inc./ Bard Peripheral Vascular. This device was introduced in the market in late 2005. C.R. Bard, Inc./ Bard Peripheral Vascular's statistics indicate that since the G2™ Filter System's introduction to the market, 65,000 units have been sold worldwide. This represents a period of approximately three years, from 2005 until 2008.

[5] In 2005, the New England Society for Vascular Surgery reported a 31.7% fracture rate of the Recovery® Filter. This report followed the Society's examination of the F.D.A. "MAUDE" database which records adverse patient-product events, like failure of an IVC filter. In 2008, the Journal of Vascular and Interventional Radiology published an article by Robertson and Hull (*Bard Recovery Filter: Evaluation and Management of Vena Cava Limb Perforation, Fracture, and Migration*, Journal of Vascular and Interventional Radiology, November 2008) indicating a 21% device fracture rate in the Recovery Filter System.

28. Other medical research studies indicate that the design of the Recovery™ Filter System causes it to be predisposed to a high incidence of penetration of the walls of the vena cava.[6] Specifically, the distal points of the Recovery™ Filter System's struts have been observed to perforate the walls of the vena cava. When this occurs, the perforating strut becomes fixed in its position and resists flexion or movement. The fixed struts then become subjected to a high frequency of bending stress due to the vena cava walls' movement during normal respiration and cardiac cycles. Researchers have discovered that this leads to metal fatigue in the strut, at a point just below the Recovery™ Filter System's cap.[7] Metallurgical analysis also confirms the Recovery™ Filter System's proneness to bending metal fatigue and fracture. The metal fatigue causes the strut to bend, and then, fracture.

29. The Recovery™ Filter System was pulled from the market by the defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., in 2005. It is no longer commercially available. It was replaced by the G2™ IVC filter, also manufactured by the defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC. The G2™ has been approved by the F.D.A. only as a permanent implant device. It has not been approved for retrievable use.

30. In his research, Dr. Jeffrey Hull proposed that the design change in the Recovery™ Filter System that are found in the G2™ filter system may have "corrected" the problems of perforation and migration.

---

[6] *See*, *Recovery ™ Vena Cava Filter: Experience in 96 Patients*, Kalva, *et al*, Journal of Cardiovascular and Interventional Radiology, (2006) 29: 559-564- showing a 27.4% vena cava penetration rate with the Recovery™ Filter System. This same study called for "additional studies to determine the long term safety of the device."

[7] *Retrieval of the Recovery Filter after Arm Perforation, Fracture, and Migration to the Right Ventricle*, Hull *et al*, J. Vasc. Interv. Radiol. 2008; 19:1110. In this study, Dr. Hull compares this bending stress to that of bending a paper clip back and forth until it breaks.

8

31. Additional studies have revealed that the Recovery™ Filter System is also prone to "tilt" following placement within the vena cava and/or improper deployment.[8]

32. The G2™ filter is advertised by the defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., to have "enhanced fracture resistance", "improved centering" and "increased migration resistance." BARD PERIPHERAL VASCULAR INC.'s website[9] indicates that "data is on file" with respect to these product enhancements.

33. Furthermore, the F.D.A. "MAUDE" (Manufacturer and User Facility Device Experience) database includes several reports of the failure, fracture and migration of the Recovery™ Filter System.

## WHAT HAPPENS WHEN THE RECOVERY™ FILTER SYSTEM FAILS?

34. The failure (fracture and/or migration) of the Recovery™ Filter System leads to a number of different, and potentially, fatal, complications. These complications include, but are not limited to:

   a. Death;
   b. Hemorrhage;
   c. Cardiac/ pericardial tamponade (pressure caused by a collection of blood in the area around the heart);
   d. Severe and persistent pain; and
   e. Perforation of tissue, vessels and organs.

35. The person who experiences failure (fracture and/or migration) of the Recovery™ Filter System typically experiences an acute onset of chest pain and shortness of breath. This typically results in the person presenting to an emergency room, hospital and/or physician for evaluation.

## THE DEFENDANTS' KNOWLEDGE OF THE FAILURE OF THE RECOVERY™ FILTER SYSTEM AND THE

---

[8] *See*, *Retrieval of the Recovery Filter after Arm Perforation, Fracture, and Migration to the Right Ventricle*, Hull *et al*, J. Vasc. Interv. Radiol. 2008; 19:1107-1111.

[9] www.bardpv.com/_vascular/product.php?p=83

## DANGERS ASSOCIATED WITH THE DEVICE

36. Upon information and belief, plaintiffs allege that as early as 2003, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were aware and had knowledge of the fact that the Recovery™ Filter System was defective and dangerous and was causing injury and death to patients who had received the Recovery™ Filter System.

37. Upon information and belief, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., own internal data established that the failure rate of the Recovery™ Filter System was exceedingly higher than the rate the defendants were publishing to the medical community, members of the public and the United States Food & Drug Administration (F.D.A.).

38. Upon information and belief, from the time the Recovery™ Filter System became available on the market, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., embarked on an aggressive campaign of "off label marketing" concerning the Recovery™ Filter System. This included representations made to physicians, healthcare professionals and other members of the medical community, that the Recovery™ Filter System was safe and effective for retrievable use prior to the FDA approving the Recovery™ Filter System for retrievable use.

39. Prior to introducing the Recovery™ Filter System to the market, the Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. the Defendants had *actual* knowledge of the dangers to human life and health presented by the Recovery™ Filter System, yet despite their knowledge of those risks, made a conscious decision to aggressively market the product to the medical community.

10

40. Upon information and belief, after gaining knowledge of the fact that the Recovery™ Filter System was causing injury and death to patients, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., did the following:

    a. Failed to report the defective nature of the Recovery™ Filter System, as well as the incidences of injury and death to the F.D.A.

    b. Despite knowledge that the device was defective and causing injury and death to patients, made a decision to continue to market and sell the Recovery™ Filter System until such time its successor device (the G2™) was ready for introduction to the market.

## LIABILITY OF THE DEFENDANTS

### COUNT I

### (Negligence)

41. Plaintiffs adopt and incorporate by reference paragraphs 1 – 40 as if pleaded herein verbatim.

42. At all times relevant to this cause of action, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were in the business of developing, marketing and selling sophisticated medical devices, including the Recovery™ Filter System.

43. At all times relevant to this cause of action, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were under a duty to develop, manufacture, market and sell a product that did not present a risk of harm or injury to those people receiving the Recovery™ Filter System, including plaintiff, DARLENE BLOOMQUIST.

44. At the time of manufacture and sale of the Recovery™ Filter System (2002 until October 2005), the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., knew or should have known that the Recovery™ Filter System:

a. Was designed and manufactured in such a manner so as to present a risk of fracture of portions of the device;

b. Was designed and manufactured so as to present a risk of migration of the device and/or portions of the device; and/or

c. Was designed and manufactured to have insufficient strength or structural integrity to withstand normal placement within the human body.

45. Despite the aforementioned duty, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., committed one or more breaches of the duty and were generally negligent, careless, and reckless in:

a. failing to properly warn of the dangers and risks of harm associated with the Recovery™ Filter System, *to wit*, the incidence of failure of the Recovery™ Filter System;

b. manufacturing a product, *to wit*, the Recovery™ Filter System, that was insufficient in strength or structural integrity to withstand the foreseeable use of normal placement within the human body;

c. designing a product, *to wit*, the Recovery™ Filter System, that was insufficient in strength or structural integrity to withstand the foreseeable use of normal placement within the human body; and

d. designing a product, *to wit*, the Recovery™ Filter System, that presented a risk of harm to the plaintiff and others similarly situated in that it was prone to failure.

46. The foregoing acts of negligence, wrongful acts and/or omissions were a substantial factor in causing plaintiffs' injuries and damages as alleged below.

47. As a direct and proximate result of the conduct of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as aforesaid, DARLENE BLOOMQUIST has suffered permanent and continuing injury, pain and suffering, disability and impairment. DARLENE BLOOMQUIST has suffered emotional trauma, harm and injuries that will continue into the future. DARLENE BLOOMQUIST has been unable and will continue to be unable to carry on the affairs of her daily life.

48.    As a direct and proximate result of the conduct of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as aforesaid, the plaintiffs have incurred substantial medical expenses, and will continue to incur substantial medical expenses into the future.

## COUNT II

### (Strict Liability/Products Liability Manufacturing and Design Defects)

49.    Plaintiffs adopt and incorporate by reference paragraphs 1 – 48 as if pleaded herein verbatim.

50.    The Recovery™ Filter System designed, manufactured, and sold by defendants was implanted in plaintiff, DARLENE BLOOMQUIST, as intended and in the same condition as when it left the defendants' possession and control.

51.    At the time of implantation, as aforesaid, the defendants' Recovery™ Filter System was in a defective and unreasonably dangerous condition in that:

    a.    It was designed and manufactured so as to be insufficient to withstand the foreseeable use of placement in the human body;

    b.    It was designed so as to be prone to fracture and/or migrate to parts of the human body;

    c.    It was manufactured defectively inasmuch as the exterior surface of the Recovery™ Filter System was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail; and

    d.    Defendants failed to warn physicians, surgeons, and patients of the inherent latent dangers resulting from its foreseeable use so that an informed decision could be made as to its use.

52.    The foregoing wrongful acts and/or omissions were a substantial factor in causing plaintiffs' injuries and damages as alleged below.

53. As a direct and proximate result of the conduct of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as aforesaid, DARLENE BLOOMQUIST has suffered permanent and continuing injury, pain and suffering, disability and impairment. DARLENE BLOOMQUIST has suffered emotional trauma, harm and injuries that will continue into the future. DARLENE BLOOMQUIST has been unable and will continue to be unable to carry on the affairs of her daily life.

54. As a direct and proximate result of the conduct of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as aforesaid, the plaintiffs have incurred substantial medical expenses, and will continue to incur substantial medical expenses into the future.

## COUNT III

### (Breach of Express & Implied Warranties)

55. Plaintiffs adopt and incorporate by reference paragraphs 1 – 54 if pleaded herein verbatim.

56. At all times relevant to this cause of action, the Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. were merchants of goods of the kind including endovascular medical devices and vena cava filters (like the Recovery™ Filter System).

57. At the time and place of sale, distribution, and supply of the defendants' Recovery™ Filter System to plaintiff, defendants expressly represented and warranted that the Recovery™ Filter System was safe, and impliedly warranted that the product was reasonably fit for its intended purpose and was of marketable quality.

58. At the time of the plaintiff's purchase of the Recovery™ Filter System from the Defendants, it was not in a merchantable condition in that:

14

a. It was designed in such a manner (as set forth in more detail *supra*) so as to be prone to a statistically high incidence of fracture and/or migration;

b. It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy; and

c. It was manufactured in such a manner so that the exterior surface of the Recovery™ Filter System was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail.

59. Said implied warranties were further breached in that:

a The defendants failed to provide the warning or instruction and/or an adequate warning or instruction which a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that said Recovery™ Filter System would cause harm;

b. The defendants manufactured and/or sold the Recovery™ Filter System that did not conform to representations made by the defendants, when it left the defendants' control;

c. The defendants manufactured and/or sold the Recovery™ Filter System that was more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and the foreseeable risks associated with the Recovery™ Filter System's design or formulation exceeded the benefits associated with that design or formulation. These defects existed at the time the product left the defendants' control; and

d. The defendants manufactured and/or sold the Recovery™ Filter System that deviated in a material way from the design specifications, formulas, or performance standards or from otherwise identical units manufactured to the same design specifications, formulas, or

15

performance standards, and these defects existed at the time the product left the defendants' control.

60. Furthermore, defendants' marketing of the Recovery™ Filter System was false and/or misleading.

61. Plaintiff, through her attending physicians, and through the Skaggs Regional Medical Center Radiology Department, relied on these representations in determining which IVC filter to use in the implantation in plaintiff.

62. Defendants' Recovery™ Filter System was unfit and unsafe for use by users as it posed an unreasonable and extreme risk of injury to persons using said product, and accordingly defendants breached their expressed warranties and the implied warranties associated wit the product.

63. The foregoing warranty breaches were a substantial factor in causing plaintiff's injuries and damages as alleged.

64. As a direct and a proximate result of the foregoing condition of the product of Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc., plaintiff, DARLENE BLOOMQUIST, suffered permanent and continuing injuries, pain and suffering, disability and impairment. DARLENE BLOOMQUIST has suffer and emotional trauma, harm and injuries that will continue into the future. DARLENE BLOOMQUIST has been unable and will continue to be unable to carry on the affairs of her daily life. Furthermore, DARLENE BLOOMQUIST has lost earnings in the past and will continue to lose earnings in the future as a result of her impairment and disability in this regard.

65. The Plaintiffs further allege that the Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. acted in willful, wanton, gross and in total disregard for the health and safety of

the user or consumer of its G2™ Filter System, acted to serve their own interests and having reason to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons. Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc., therefore, should be required to respond to the plaintiffs in the form of a punitive or exemplary damage award.

### COUNT IV
### (Loss of Consortium)

66. Plaintiff, LARRY L. BLOOMQUIST, adopts and incorporates by reference paragraphs 1 – 65 as if pleaded herein verbatim.

67. At all times material hereto, plaintiff, LARRY L. BLOOMQUIST, was the husband of DARLENE BLOOMQUIST.

68. As a direct and proximate result of the conduct of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as aforesaid, and the injuries of his wife, DARLENE BLOOMQUIST, plaintiff LARRY L. BLOOMQUIST has experienced the loss of consortium and an interruption of his marital relationship with his wife, DARLENE BLOOMQUIST, including but not limited to a loss of the general society, companionship, and services of DARLENE BLOOMQUIST.

### COUNT V
### (Punitive Damages)

69. Plaintiffs adopt and incorporate by reference paragraphs 1 – 68 as if pleaded herein verbatim.

70. The misconduct of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as detailed above, constituted, a conscious willful, malicious, wanton,

17

and/or reckless disregard for the safety of the plaintiffs. The defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., had actual knowledge of dangers to the life and limb of the plaintiffs presented by the Recovery™ Filter System, yet failed to act reasonably to:

    a.    Inform or warn the plaintiffs or their physicians or the public at large of the dangers; and

    b.    Recall the Recovery™ Filter System from the market in a timely and safe fashion.

71. Despite having knowledge as early as 2003 of the dangerous and defective nature of the product, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., continued to actively market and offer for sale the Recovery™ Filter System until its successor product, the G2™ was introduced in late 2005.

72. The foregoing acts were a substantial factor in causing plaintiffs' injuries and damages as alleged below.

73. Defendants' willful, malicious, wanton, and/or reckless misconduct justifies the implementation of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs demand compensatory and punitive damages from all defendants, jointly and severally, in amounts to be determined by the trier of fact. Plaintiffs further demand post-judgment interest, where appropriate, as well as such other relief as a judge and jury may deem just, and for other general or equitable relief due the plaintiffs.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable in this civil action.

                        **DARLENE BLOOMQUIST and LARRY L. BLOOMQUIST, her spouse**, Plaintiffs,


                        By:   Aaron C. Johnson
                                   Counsel for Plaintiffs


David Summers (Mo.Bar #42290)
Aaron C. Johnson (Mo.Bar #38756
SUMMERS & JOHNSON, P.C.
105 East 5th Street, Suite 401
Kansas City, Missouri 64106
(816) 283-3200
(816) 221-5370 (fax)

Jack D. Davis (Illinois Bar # 6274780)
DAVID LAW OFFICES, LLC
319 East Madison Street
Springfield, Illinois 62701
(217) 679-0393
(217) 679-0401 (fax)

R. Dean Hartley (WV Bar# 1619)
J. Michael Prascik (WV Bar # 9135)
HARTLEY & O'BRIEN, PLLC
2001 Main Street, Suite 600
Wheeling, WV 26003
(304) 233-0777
(304) 233-0774 (fax)